United States District Court
Southern District of Texas
FILED

AUG 27 2019

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Criminal No. 4:19CR613 |
| | | UNDER SEAL |
| BOBBY HOBBS, M.D.(1), | § | |
| JAMES DON JACKSON, JR., M.D. (2) | § | |
| KONDRE DEMON GRAVES (3), | § | |
| TARA WILLIAMS GRAVES (4), and | § | |
| TAMEKA MOORE (5), | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

    a. Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(xiii). Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

    b. At all times relevant, and as of October 6, 2014, hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(vi). Prior to October 6, 2014, hydrocodone was classified as a Schedule III controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

    c. Alprazolam was classified as a Schedule IV controlled substance. Alprazolam, sometimes prescribed under the brand name Xanax, was a benzodiazepine and a purported anti-anxiety medication and was highly addictive. When combined with an opioid, alprazolam substantially increases the chances of death from respiratory failure.

    d. Carisoprodol, was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommends carisoprodol only for acute treatment for two to three weeks at a time.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone, and carisoprodol and/or alprazolam significantly increased the risk of patient intoxication and overdose. Prescribing oxycodone or hydrocodone, and/or carisoprodol or alprazolam, often created a significant risk of diversion because the these drugs, when prescribed together, were often highly abused and sought not for any medical purpose but rather for the

increased "high" a user may experience from taking hydrocodone or oxycodone, on the one hand, along with carisoprodol and/or alprazolam, on the other.

6. Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol and/or alprazolam for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7. Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe or distribute controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8. Chapter 21 of the Code of Federal Regulations, Section 1306.04, governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

3

9. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") up until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). Pharmacies were required to report to the PMP all controlled substances dispensed, including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

10. In Texas, special licensure is required for a "publicly or privately owned facility for which a majority of patients are issued, on a monthly basis, a prescription for opioids, benzodiazepines, barbiturates, or carisoprodol." Tex. Admin. Code § 195.1(2). Texas has codified Minimum Requirements for the Treatment of Chronic Pain. *Id.* § 170.3. In 2016, the Centers for Disease Control (CDC) issued a *Guideline for Prescribing Opioids for Chronic Pain*. Common to all is the notion that opioids are "dangerous drugs," *e.g.*, Tex. Admin. Code § 170.3(1)(C), and that treatment involving them must be subjected to a litany of precautionary measures monitored by the prescribing physician and, where necessary, other specialists, *e.g.*, *id.* § 170.3(6).

11. Texas has also codified a pharmacist's obligation to serve as an independent backstop to deter the potential for abuse and diversion of opioids and other controlled substances. Tex. Admin. Code § 291.29. The Texas State Board of Pharmacy distributed to newly licensed pharmacies a document called: "Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF...," which largely mimicked Texas Admin. Code § 291.29 (f). The document identified

the following "red flags," among others, related to non-therapeutic prescribing and dispensing of controlled substances:

    a.    prescriptions by a prescriber presented to the pharmacy are routinely for controlled substances commonly known to be abused drugs, including opioids, benzodiazepines, muscle relaxants, psychostimulants, and/or cough syrups containing codeine, or any combination of these drugs;

    b.    prescriptions for controlled substances are commonly for the highest strength of the drug and/or for large quantities (e.g., monthly supply), indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

    c.    dangerous drugs or over-the-counter products (e.g., multi-vitamins or laxatives) are consistently added by the prescriber to prescriptions for controlled substances presented to the pharmacy, indicating a lack of individual drug therapy in prescriptions issued by the practitioner;

    d.    the practitioner's clinic is not registered as, and not exempted from registration as, a pain management clinic by the Texas Medical Board, despite prescriptions by the practitioner presented to the pharmacy indicating that the practitioner is mostly prescribing opioids, benzodiazepines, barbiturates, or carisoprodol . . . or any combination of these drugs;

    e.    the controlled substance(s) or the quantity of the controlled substance(s) prescribed are inconsistent with the practitioner's area of medical practice; and

    f.    persons pay with cash or credit card more often than insurance;

## ENTITIES AND DEFENDANTS

12.    **Dr. Bobby HOBBS (1)**, DEA #BH0840694, was a high-volume prescriber of oxycodone and carisoprodol in Houston. Prior to moving his DEA Registration to Houston in 2018, **HOBBS**, a Dallas area emergency room practitioner, had never issued a prescription for oxycodone. Upon his arrival to Houston in June 2018, **HOBBS** began prescribing oxycodone and carisoprodol out of cash-only clinics, including one located at 6550 Mapleridge Street, Suite 216, Houston, TX 77081 ("MAPLERIDGE 216"), and another, Chasen Community Care Clinic, 10101

5

Harwin Drive, Suite 274, Houston, TX 77036 ("CHASEN"). **HOBBS** dispensed over 1 million combined dosage units of hydrocodone, carisoprodol, and oxycodone onto the streets of Houston during his brief time as a physician practicing there.

13.   **Dr. James Don JACKSON, Jr. (2)**, DEA #BJ2565262, was a hospitalist who mostly practiced out of Palestine, Texas, hours away from Houston. **JACKSON** issued minimal Schedule II controlled substance prescriptions prior to October 2017. On or about September 25, 2017, **JACKSON** changed his DEA registration address to Diamond Wellness & Health Center PLLC, 6300 Richmond Avenue, Suite 210, Houston, TX 77057 ("DIAMOND WELLNESS"), before changing his registration again on December 21, 2017, to 6550 Mapleridge Street, Suite 218, Houston, TX 77081 ("MAPLERIDGE 218") (collectively, MAPLERIDGE 216 and MAPLERIDGE 218 are "MAPLERIDGE"). Within two weeks of arriving in Houston, **JACKSON**'s PMP reflects a significant increase of prescriptions for 30-day or near 30-day supplies of hydrocodone 10-325mg, oxycodone 30mg and carisoprodol 350mg. In April 2019, JACKSON established Peoples Family Practice and Pediatrics, 7400 Harwin, Suite 319, Houston, TX, 77036 ("PEOPLES"). In all, **JACKSON** dispensed more than 1.2 million combined dosage units of hydrocodone, carisoprodol, and oxycodone onto the streets of Houston during his brief time as a physician practicing there.

14.   **KONDRE D. GRAVES (3)** is a gang-affiliated individual and a longtime drug dealer. **KONDRE D. GRAVES** and his wife **TARA WILLIAMS GRAVES (4)** have run multiple illegal pain-management clinics in Houston, Texas, operating each as a "pill mill," with the purpose to make money selling prescription pharmaceuticals for profit on the

street. **KONDRE** and **TARA** paid DEA registered physicians for access to their prescription pads, nothing more. **JACKSON** and **HOBBS** were two pill mill physicians.

15.  **Tameka MOORE (5)** was one of **KONDRE**'s subordinates, who assisted **KONDRE** in finding and processing individuals posing as patients and, ultimately, acquiring the pharmaceutical opioids and other dangerous drugs of abuse that were to be diverted onto the black market, in the Southern District of Texas and elsewhere.

## COUNT 1
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

16.  Paragraphs 1 through 15 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

17.  From in or around December 2017 through in or around August 2019, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**BOBBY HOBBS, M.D.,**
**JAMES DON JACKSON, JR., M.D.,**
**KONDRE DEMON GRAVES,**
**TARA WILLIAMS GRAVES, and**
**TAMEKA MOORE**

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with others known and unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally unlawfully distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other

controlled substances, outside the usual course of professional practice and not for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## Purpose of the Conspiracy

18. It was a purpose and object of the conspiracy for the Defendants, and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

## Manner and Means of the Conspiracy

The manner and means by which **HOBBS, JACKSON, KONDRE, TARA, MOORE,** and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

19. **HOBBS** and **JACKSON** used their statuses as a licensed physicians, their DEA Registration Numbers, and their MAPLERIDGE, CHASEN, and PEOPLES medical practices, to prescribe and to enable their co-conspirators to prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, without regard to medical necessity, and for the purpose of obtaining cash and other financial benefits.

20. **KONDRE**, **TARA**, and **MOORE** obtained from co-conspirator crew leaders, runners, and others, individuals who were paid and provided other benefits to pose as patients to obtain prescriptions for controlled substances at MAPLERIDGE, CHASEN, and PEOPLES.

21. With **HOBBS** and **JACKSON**'s knowledge and approval, **KONDRE** and **TARA** issued in **HOBBS** and **JACKSON**'s names, and caused to be issued in **HOBBS** and **JACKSON**'s names, prescriptions for dangerous and addictive pharmaceutical drugs, without regard to whether **HOBBS** and **JACKSON** had evaluated them. **HOBBS**, **JACKSON**, and their co-conspirators conducted only perfunctory examinations, if they conducted any at all.

22. **HOBBS** and **JACKSON** prescribed and enabled their co-conspirators to prescribe high dosage strengths of oxycodone (30mg), hydrocodone (10/325mg), carisoprodol (350mg), and alprazolam (2mg), each a component of what is often referred to as the "Houston cocktail." **HOBBS** and **JACKSON** prescribed and enabled their co-conspirators to prescribe these drugs in large, mostly uniform amounts: around 120 pills (hydrocodone, oxycodone), 90 pills (carisoprodol), and 60 pills (alprazolam).

23. MAPLERIDGE, CHASEN, and PEOPLES accepted cash only, ranging from $250 to $300 or more for hydrocodone prescriptions, and from $500 to $600 or more for oxycodone prescriptions. These amounts were paid by the crew leaders and runners, whether directly or through the individuals posing as patients.

All in violation of Title 21, United States Code, Section 846.

### COUNTS 2-6
### Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting
### (21 U.S.C. § 841 & 18 U.S.C. § 2)

24. Paragraphs 1-23 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

| Count | Defendant(s) | Prescriber | Patient | Drug | Quantity | Approximate Date of Prescription |
|---|---|---|---|---|---|---|
| 2 | **HOBBS KONDRE** | HOBBS | S.B. | Oxycodone 30mg | 110 | 8/1/18 |
| 3 | **HOBBS KONDRE** | HOBBS | P.M. | Oxycodone 30mg | 110 | 7/9/18 |
| 4 | **JACKSON TARA** | JACKSON | D.P. | Oxycodone 30mg | 115 | 6/25/19 |
| 5 | **JACKSON TARA** | JACKSON | I.R. | Oxycodone 30mg | 110 | 6/25/19 |
| 6 | **MOORE** | HOBBS | E.J. | Oxycodone 30mg | 110 | 10/1/18 |

25. On or about the dates specified below, in the Houston Division of the Southern District of Texas, the Defendants specified below, aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally unlawfully distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, the controlled substances alleged below:

All in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), (b)(2) & Title 18, United States Code, Section 2.

### COUNT 7
**Maintaining a Drug-Involved Premises and Aiding and Abetting**
**(21 U.S.C. § 856(a)(1) & 18 U.S.C. § 2))**

26. Paragraphs 1-25 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

27. From in or around October 2017 through in or around June 2018, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants

**KONDRE DEMON GRAVES and
TARA WILLIAMS GRAVES,**

aiding and abetting and aided and abetted by others, did unlawfully and knowingly use and maintain a place known as MAPLERIDGE at 6550 Mapleridge Street, Suites 216 and 218, in Houston, Texas, 77081, for the purpose of distributing Schedule II controlled substances, including oxycodone and hydrocodone, outside the usual course of professional practice and without a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 856(a)(1) & Title 18, United States Code, Section 2.

### NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853(a))

28. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants, that upon conviction of an offense in violation of Title 21, United States Code, Sections 841, 846, or 856 the following is subject to forfeiture:

    a. all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

    b. all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

### Money Judgment and Substitute Assets

29. The United States will seek the imposition of a money judgment against each Defendant upon conviction.

30. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment against that Defendant.

A TRUE BILL

Original Signature on File

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING CHIEF, HEALTH CARE FRAUD UNIT
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*for [signature]*
DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE